# Rockport Coal Company v. Barnard, Administratrix, Etc.

# Rockport Coal Company v. Adams.

(Decided June 19, 1925.)

## Appeals from Ohio Circuit Court.

1. Trial—Instruction on Employe's Duty of Inspection Held Not Proper where no Question Thereof Either in Pleading or Evidence.—In action for death of miner, where there was no question, either in pleadings or evidence, involving duty of inspection on part of decedent, instruction that decedent was under no duty to inspect, or repair roof was improper.

2. Master and Servant—Instruction Held Erroneous, as Imposing Absolute Duty on Employer to Maintain Mine Roof Free From Hanging Slate.—Instruction that deceased miner, injured by contact with roof, was under no duty to inspect roof, and had a right to assume employer would maintain it free from hanging slate, held erroneous, as making it absolute duty of employer to maintain roof free from hanging slate; employer being required to exercise only ordinary care to maintain roof in reasonably safe condition.

3. Master and Servant—Instruction Held Objectionable as Relieving Miner from Any Duty of Care.—Instruction that deceased miner had right to assume that employer would maintain roof free from hanging slate, was objectionable, in that it might have been understood by jury to relieve decedent from any duty to look out for or protect himself from such obstruction.

4. Trial—Instruction Making it Absolute Duty of Mine Owner to Maintain Roof Free from Hanging Slate Held Erroneous, Though Other Instruction Properly Defining Duty.—In action for death of miner, instruction making it absolute duty of defendant to maintain roof free from hanging slate held prejudicial error, though another instruction properly told jury it was duty of defendant to exercise ordinary care to maintain roof in reasonably safe condition.

5. Witnesses—Exclusion of Written Statement Inconsistent with Testimony, Though Merely Expressing Opinion, Held Error.—Where witness testified that there was hanging slate at place where plaintiff's intestate was killed, but prior to trial he had signed statement that it was his honest opinion that deceased was hurt because he raised himself too high while riding in bank car, such statement, though merely expressing an opinion, being inconsistent with his testimony was competent to destroy or weaken latter and exclusion thereof was error.

6. Master and Servant—Instruction on Wilful Misconduct of Miner Held Properly Refused.—Where miner at time of his death was riding in a bank car, which company furnished to carry miners

to their places of work, an instruction on wilful misconduct was properly denied, for if he violated company's rule such violation is contributory negligence and not wilful misconduct.

7. Evidence—Expression of Opinion as to Danger of Riding on Front of Bank Car With Driver, Inadmissible.—In action for death of miner while riding on a bank car taking him to his place of work, mere expressions of opinions of witnesses as to danger of riding on front of car with driver, are inadmissible.

8. Master and Servant—Wilful Misconduct of Fellow Servant Not Bar to Recovery.—Fact that fellow servant, by his own wilful misconduct, brought injuries to himself and consequent injury to plaintiff employe does not bar plaintiff's recovery therefor; fellow servant doctrine not being available as a defense, where employer failed to elect to operate under workmen's compensation act.

BARNES & SMITH and J. S. GLENN for appellant.

WOODWARD & KIRK for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Reversing the Barnard case and affirming the Adams case.

Appellant operates a coal mine, known as a shaft mine; the bottom is something over 100 feet below the surface.

Its employes are taken into the mine by an elevator, and when they reach bottom they are taken to their several places of work in bank cars drawn by mules. These cars go along the track in the main entry until the workmen reach their respective places of work in the cross entries or rooms, or get near to them.

In transporting the coal from the rooms and through the side entries to the main entry mules are used in drawing the cars, but when they reach the main entry they are taken by a motor propelled by electricity and taken out. So that along the main entry there is erected a wire for the transmission of this power. The electricity, however, is not turned on in that entry until seven o'clock in the morning, at which time the workmen are all supposed to be in their places of work, and it is turned off in the afternoon before they are supposed to stop their work.

The bank cars are collected at or near the bottom of the shaft in the morning so that the drivers may attach to them their mules and carry the workmen through the main entry in the mule drawn cars before the electricity is turned on.

Barnard was the driver of a bank car, and Adams was a coal-loader. When Barnard reached the bottom on the morning of January 9, 1920, there was left only one car available for the transportation of the remaining workmen to their places of work, and that car had then already been appropriated by another who had hitched his mule to it, and this left no car to which Barnard might attach his mule. The other cars had all left with their loads of workmen, and, including the two drivers, there were fourteen workmen left.

The trolly wire in the main entry was attached to hangers which were in turn attached to the roof, and ran approximately one foot to the right of the right-hand rail going in, and near the rib or wall on that side.

The bank cars were nine feet in length, two feet, 11 inches wide at the bottom of the bed, but had a nine inch flange on each side sloping upward, so that the car was four feet in width at the top, and was two feet deep at the front end and seventeen inches at the rear. The top of the car was two feet and eleven inches from the top of the rail. There was a bumper on the rear end of the car where two men sometimes rode. Those riding inside of the car sat or rested upon the sloping flanges on each side, and faced those riding on the other side. There was a place on the front of the car for the driver to sit, and sometimes another sat in front with him. The driver sat on the left side of the front end, and such other on the right side.

There being only one car left the fourteen men proceeded to place themselves in or upon it for the trip, Barnard turning his mule loose in the entry and getting on the front end of the car with the driver. Barnard and the driver faced the way the mule was going, while the two on the rear of the car faced backward, and the five on each side of the car within the body sat facing each other.

The roof in the main entry was about forty-eight inches above the rails of the track, but at places it was considerably higher because of fallen slate. The workmen carried carbide lamps in their caps, but when riding in the car either removed or dimmed them because of their close proximity to each other while so riding.

While thus riding it was necessary for all the occupants to sit in a stooped position to avoid coming in conact with the roof, as there was a space of only thirteen

inches between the top of the car and the roof at certain places.

When the car started Barnard was sitting in front on the right of the driver, and Adams sitting in the body of the car just behind him, and all of the occupants as they proceeded were in a stooped position. When they had gone some distance into the main entry Barnard's head came in contact with the roof or some obstacle, and he was knocked backward on the shoulders and back of Adams, who was sitting immediately behind him, and before the car could be stopped it had gone some twelve or fifteen feet and during that time Barnard's body was crushed and scraped against the roof, being between it and the body of Adams and other occupants of the car, the witnesses referring to it as being "roofed."

Barnard died the next day from his injuries, and Adams received some injuries, and these two suits resulted. They were tried together in the circuit court, and a verdict of $15,000.00 returned for Barnard's estate, and $500.00 in the Adams case. The appeals are from both judgments, but on the same record.

In the Barnard case the negligence alleged is that defendant so negligently managed, maintained and operated its mine and the entries and equipment therein that Barnard was hurled with great force against a piece of slate, or other hard substance projecting from the roof or side of the main entry, causing his injuries as stated. There was no allegation in the petition, however, that the company was operating under or entitled to operate under the workmen's compensation act.

The answer is a general denial, and in separate paragraphs pleas of contributory negligence, assumption of risk, and a wilful violation of the rules by Barnard resulting in his death, were relied upon.

The plaintiff filed demurrers to each of the three last named paragraphs, and disclosed therein for the first time that defendant was entitled to operate under the provision of the compensation act, but had not elected so to do. Before action on the demurrers a reply was filed, and thereafter an amended reply wherein it was alleged appellant was engaged in coal mining and entitled to operate under the compensation act, and had not elected so to operate, and that therefore the defenses of contributory negligence, assumed risk, and the negligence of a fellow servant were not available to it as defenses.

The pleadings in the Adams case present practically the same issues, except as to violation of rules hereinafter referred to.

For the plaintiff one of the occupants of the car in which Barnard and Adams were riding testified that he saw the hanging slate at the place of the accident in ten minutes after it happened, and saw blood on it, and that it was hanging two or three inches below the normal surface. He also testified that he had observed this hanging slate either the day before or two days before the accident. Another witness who was an occupant of one of the cars that morning which had preceded the one in which Barnard and Adams were riding, testifies that he on that morning, while going into the mine, saw hanging slate at some point in the main entry, but does not definitely fix it as at the place where Barnard received his injury. There were other facts and circumstances in evidence, not necessary to enumerate, tending to corroborate these statements as to the existence of hanging slate which brought about these injuries.

On the other hand several of the occupants of the car, and other employes of defendant, testified that a short time before and a short time after the accident the roof at that place was in its normal condition, some of them saying only that so far as they saw or noticed there was no hanging slate at that place.

Upon mature consideration we have reached the conclusion that there are two errors in the record which must result in the reversal of the Barnard case; (1) the giving of instruction No. 5, wherein the jury was told that decedent was under no duty to inspect or repair the roof, "and that he had a right to assume that the defendant would maintain it free from hanging slate," and (2) the refusal of the court to admit in evidence a signed statement by the witness Flener made prior to the giving of his evidence, wherein he made statements apparently inconsistent with his evidence on the stand.

In the first place there was no question either in the pleadings or the evidence involving the duty of inspection upon the part of decedent, and in the next place the instruction as framed makes the duty of defendant to maintain the roof free from hanging slate an absolute one, rather than to place upon it the duty to use ordinary care to so maintain it. Not only so, the court had already in instruction No. 1 properly told the jury it was the duty of defendant to use ordinary care to maintain the roof

in a reasonably safe condition. It is clear, therefore, not only that instruction No. 5 was wholly unnecessary because there was no issue as to the duty of inspection, but because the duty of maintaining the roof in a reasonably safe condition had already been imposed upon defendant in the first instruction.

But it may be said that under the circumstances there was no prejudicial error because, considering the instructions as a whole, the jury must have understood them; but we have in one instruction the correct duty imposed upon defendant of using ordinary care to maintain the roof in a reasonably safe condition, and we have in the other an absolute duty imposed upon it of so maintaining the roof, and the right given to decedent to assume that defendant would so maintain it. Not only did instruction No. 5 impose a duty upon the defendant which the law does not authorize, but it likewise tells them that decedent might assume that defendant would maintain it free from hanging slate, which might easily have been understood by the jury to relieve decedent himself from any duty to look out for or protect himself from such obstructions. Likewise instruction No. 5 appears to authorize a recovery for plaintiff, if his injury resulted from hanging slate no matter how recently such a condition might have come about, while in instruction No. 1, wherein the proper duty was imposed, there was a qualification to the effect that if defendant did not know of the same, or by the exercise of ordinary care could not have known thereof in time to have removed the danger, there could be no recovery. Not only should instruction No. 5 not have been given at all, but as given it imposed upon defendant a duty which the law does not impose, and was susceptible of the interpretation the decedent himself was not required to exercise any care for his own safety. The requirement that defendant should maintain the roof free from hanging slate that might unnecessarily endanger the safety of its employes going into the mine, imposes a higher duty than one placing upon it only the duty to exercise ordinary care to maintain the roof in a reasonably safe condition. Reffitt v. S. & S. T. P. Co., 170 Ky. 362; Hazard Coal Co. v. Wallace, 181 Ky. 636.

We are impelled, therefore, to hold that the giving of instruction No. 5 was prejudicial error.

The witness Flener was the only witness in the case who definitely stated that there was hanging slate at the

place of the accident, and prior to the giving of his testimony on the trial he had given a signed statement of which the following was a part:

"It is my honest opinion that the reason Will (meaning Barnard) was hurt was because he was sitting in a cramped position and tried to raise up to ease himself and on account of the crowded condition of the car raised himself too high."

On the trial defendant offered to introduce this signed statement as tending to contradict the positive statements of Flener as to the existence of the hanging slate and the cause of the injury, and the court declined to permit the quoted portion of it to be considered.

Without Flener's evidence the case would not have been submitted to the jury, and as this prior statement of his may in some of its aspects be considered as wholly inconsistent with his evidence on the trial, we are of opinion that the court erred in not permitting the same to be heard as contradicting it. It is true the language in which that part of the statement is couched is technically only an expression of opinion by Flener; but when it is considered that he was an occupant of the car and a witness to the accident itself, it is difficult to harmonize that expression of opinion with his subsequent evidence on the trial. It can hardly be true that he entertained that opinion as to the cause of the injury, when according to his evidence on the trial the hanging slate was the sole cause. Clearly such an expression of opinion by him, being inconsistent with his testimony, was competent to destroy or weaken the latter; and surely this erroneous action of the court combined with the error in giving instruction No. 5, constitutes reversible error.

The evidence did not justify the giving of an instruction on wilful misconduct. At the time of the injury the decedent was in the discharge of his duty in going by the usual route to his place of work, and was guilty of nothing which was intended to or which would have in the ordinary course of events brought injury either to himself or other employes. Not only was the company supposed to carry him to his work place on its cars, but assuming he was acting in violation of the rules, such violation when considered in connection with the alleged negligence of defendant, is contributory negligence and not wilful misconduct, and consequently not available

as a defense. West Ky. Coal Co. v. Smithers, 184 Ky. 211, (second appeal) 188 Ky. 224; Hollenbach Co. v. Hollenbach, 181 Ky. 262.

Likewise the second instruction dealing with the question of habitual violation of the rules should upon another trial embrace the idea that such violation was by and with the knowledge or assent of the officers and agents of defendant, whose duty it was to enforce the rules. Upon another trial the court will admit the evidence of all the witnesses who were present as to what occurred when Barnard got on the car, but will exclude such of it as were mere expressions of opinion as to the danger of his riding on the front of the car with the driver.

The instructions in the Adams case were free from error. Adams was an employe and was riding in the body of the car, and was one of the first persons to board it, and there is no claim he was violating any rule, but was merely going to his work in the usual way. Even if Barnard had by his own wilful misconduct brought about the injury to himself, and consequently the injury to Adams, still there is no apparent reason why Adams should not recover, for the fellow servant doctrine is not available as a defense.

It is further ably and earnestly argued that the workmen's compensation act is violative of the state Constitution. Not only has this question been exhaustively considered by this court in an action brought specially for the purpose of testing the constitutionality of that act (Greene v. Caldwell, 170 Ky. 571), but similar acts have almost without exception been held constitutional in a number of other states.

In the light of the modern tendency shown by these acts to change the method of awarding compensation to injured employes, we do not feel called upon to reconsider that question.

The judgment in the Barnard case is reversed with directions to grant appellant a new trial, and for further proceedings consistent herewith; but the judgment in the Adams case is affirmed.